UNITED STATES of America,

v.

Usama BIN LADEN, et al., Defendants.

No. 98 CRIM. 1023(LBS).

United States District Court,
S.D. New York.

Aug. 17, 2000.

Sam A. Schmidt, New York City, Joshua Dratel, Kirstian K. Larsen, for Defendant El Hage.

James Roth, New York City, Lloyd Epstein, for Defendant Ali Mohamed.

Paul McAllister, New York City, Charles D. Adler, George Goltzer, for Defendant Salim.

Frederick H. Cohn, New York City, Laura Gasiorowski, David Preston Baugh, for Defendant Al-'Owhali.

Anthony L. Ricco, New York City, Edward D. Wilford, Carl J. Herman, Sandra A. Babcock, for Defendant Odeh.

Jeremy Schneider, David Stern, David Ruhnke, for Defendant K.K. Mohamed.

## OPINION

SAND, District Judge.

Three Defendants—Wadih El Hage ("El Hage"), Mamdouh Mahmud Salim ("Salim"), and Ali Mohamed ("Mohamed")—have filed motions seeking a severance of their trial from that of certain co-defendants. For the reasons set forth below, and as stated in open court on August 2, 2000, those motions are denied.

### BACKGROUND[1]

The Indictment in this case alleges the existence of an entity known as "al Qaeda," or "the Base," which is said to be led by Defendant Usama Bin Laden and which is said to be committed to the use of violence as a means of opposing the United States. (See Indictment S(7) 98 Cr. 1023(LBS) at ¶¶ 1–9.) The bombings of the United States Embassies in Nairobi, Kenya and Dares Salaam, Tanzania on August 7, 1998 ("the embassy bombings") were, according to the Indictment, the work of al Qaeda.

Of the seventeen Defendants named in the Indictment, six are presently in the custody of the United States Bureau of Prisons ("BOP") awaiting trial.[2] Of those

1. The factual and legal background of this case is more fully set forth in four prior opinions of this Court, see United States v. Bin Laden, 93 F.Supp.2d 484 (S.D.N.Y.2000); United States v. Bin Laden, 91 F.Supp.2d 600 (S.D.N.Y.2000); United States v. Bin Laden, 92 F.Supp.2d 225 (S.D.N.Y.2000); United States v. Bin Laden, 92 F.Supp.2d 189 (S.D.N.Y.2000), and an opinion of the Court of Appeals, United States v. El–Hage, 213 F.3d 74 (2d Cir.2000), familiarity with which is presumed.

2. Another three Defendants—Khalid al Fawwaz, Ibrahim Eidarous, and Adel Abdel Bary—are in the custody of the United Kingdom. The United States has requested their extradition, but is unable at this time to make any reliable estimate as to whether, and if so, when, that request might be granted. (See Government's Memorandum of Law in Re-

six, three—Mohamed Sadeek Odeh ("Odeh"), Mohamed Rashed Daoud Al-'Owhali ("Al-'Owhali"), and Khalfan Khamis Mohamed ("K.K.Mohamed")—are charged with substantive offenses arising out of the embassy bombings,[3] and with conspiring to commit those offenses. The other three Defendants in custody—Salim, El Hage, and Mohamed—are charged with conspiring to commit the embassy bombings, but not with the substantive offenses.[4] Of the three Defendants charged with substantive offenses, the Government has indicated, pursuant to the procedures set forth in the *United States Attorneys' Manual* §§ 9–10.020 to 9–10.080, that it will seek the death penalty with respect to two—Al-'Owhali and K.K. Mohamed. (*See United States v. Bin Laden*, Docs. 227 & 230, Notices of Intent to Seek the Death Penalty, 98 Cr. 1023(LBS) (S.D.N.Y. June 28, 2000).)

All seventeen Defendants are accused of being affiliated, in some way, with al Qaeda. The Government claims that it will prove at trial, beyond a reasonable doubt, that al Qaeda's activities—including the embassy bombings—were conducted through the efforts of distinct "cells" of operatives, each of which bore responsibility for particular facets of an operation. (*See* Letter from AUSA Karas to the Court of July 31, 2000, at 5.) For example, the Government theorizes that one cell would be responsible for approving an operation, a different cell would be responsible for intelligence (*i.e.*, scouting an operation, conducting surveillance), a third cell would be responsible for logistics (*i.e.*, establishing a base for the operation, trans-

porting materials), and another cell would be responsible for executing the operation. (*See id.* & *id.* at 5 n. 4 (citations omitted).) The members of each cell, according to the Government, would not necessarily be aware of the others' specific activities; their efforts would be coordinated by individuals occupying a relatively higher position in the organization. According to the Government, Defendant Salim was a member of the cell that approved the embassy bombings, Defendant Mohamed was a member of the intelligence cell, Defendant El Hage was a member of the logistics cell, and the three Defendants charged with substantive offenses were members of the execution cells. (*See id.* at 5.)

Pursuant to the Court of Appeals' instruction in *United States v. Casamento*, 887 F.2d 1141, 1151–52 (2d Cir.1989), this Court asked the Government to estimate the amount of time it would take to present its case in chief. The Government responded that it estimates it will take six to eight months for the presentation of its case if all six Defendants are tried together; five to six months for a separate trial of the three moving Defendants; and four months for a separate trial of the three non-moving Defendants. (*See* Affirmation of AUSA Patrick J. Fitzgerald of July 14, 2000, at ¶¶ 44–48.) These estimates are exclusive of any time that would be spent selecting a jury, delivering opening and closing jury addresses, and presenting defense cases, all of which together can be expected to last at least two additional months per trial. (*See id.* at ¶ 45.)

While awaiting trial, each of the six Defendants is being held subject to certain

---

sponse to Defendants' Severance Motions ("Govt.Mem.") at 15 n. 9.)

**3.** Those offenses include 224 counts of murder, in violation of 18 U.S.C. §§ 930 and 1111; 43 counts of murder of United States employees and two counts of attempted murder of United States employees, in violation of 18 U.S.C. §§ 1111, 1114, and 2; two counts of murder of internationally protected persons and 1 count of attempted murder of an internationally protected person, in violation

of 18 U.S.C. §§ 1111, 1116, and 2; one count of using explosives to commit a felony, in violation of 18 U.S.C. § 844; and two counts of using a dangerous device or bomb, in violation of 18 U.S.C. § 924. The three Defendants in English custody are also charged with these substantive offenses.

**4.** Defendant El Hage is also charged with 22 counts of perjury and false statements, in violation of 18 U.S.C. §§ 1623 and 1001.

Special Administrative Measures ("SAMs") authorized by BOP regulations for the confinement of particularly dangerous detainees. *See* 28 C.F.R. § 501.3(a) (1999). Those measures include being housed in special housing units, either alone or with a single roommate; limited access to recreational facilities; and restrictions on telephone calls, correspondence, and visits. By the time any trial of this case would commence, in January 2001,[5] all six of the Defendants will have been incarcerated pursuant to the SAMs for over a year and four of the Defendants will have been so incarcerated for over two years.[6] The Defendants have pressed numerous objections to both the length and conditions of their pretrial confinement. This Court has, on several occasions, recognized the significance of those objections and has carefully reviewed the circumstances of the Defendants' confinement before concluding that those circumstances are nonpunitive and are justified by the Government's legitimate security concerns. *See, e.g., United States v. Bin Laden,* No. 98 Cr. 1023(LBS) (S.D.N.Y. Jan. 10, 2000) (oral order), *aff'd sub nom. United States v. El–Hage,* 213 F.3d 74 (2d Cir.2000) (per curiam).

## DISCUSSION

When more than one defendant is accused of participating in the same act or transaction or series of acts or transactions,[7] federal law expresses a strong preference for a single, joint trial of all defendants. *See Zafiro v. United States,* 506 U.S. 534, 537–38, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (citations omitted); *United States v. Salameh,* 152 F.3d 88, 115 (2d Cir.1998) (citations omitted), *cert. denied,* 526 U.S. 1028, 119 S.Ct. 1273, 143 L.Ed.2d 368 (1999). Joint trials promote judicial and prosecutorial efficiency, prevent inconsistent verdicts, and deny those defendants tried second the arbitrary advantage of gaining a preview of the government's case. *See Zafiro,* 506 U.S. at 537, 113 S.Ct. 933; *United States v. Cardascia,* 951 F.2d 474, 483 (2d Cir.1991) (citing *Richardson v. Marsh,* 481 U.S. 200, 209–10, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)).

In addition to those advantages to a joint trial, which exist in nearly every multi-defendant case, the length and condition

---

5. The Court had initially set a trial date of September 5, 2000. (*See* Transcript of 9/28/99, at 12–13.) Because all counsel became concerned that such a date was not feasible, a joint request was made to consider adjourning the trial. (*See* Letter from AUSA Fitzgerald to the Court of May 15, 2000, at 2.) At a conference held in open court on May 23, 2000, it became clear that, given the number of motions the Defendants intended to file, the September trial date was not feasible, and the parties agreed (with three exceptions) to the January 3 date. (*See* Transcript of 5/23/00, at 25–32.) Although three Defendants opposed adjournment, their counsel were unable (or unwilling) to suggest a reasonable, alternative date. (*See id.* at 24–26.)

6. El Hage was brought into custody on September 16, 1998. Defendants Odeh and Al-'Owhali followed, in October, 1998. Salim arrived in this country on December 21, 1998, after having been arrested in Germany on September 6, 1998. Ali Mohamed first appeared on May 27, 1999. K.K. Mohamed was arraigned on October 8, 1999.

7. Although the Defendants do not, technically, dispute the propriety of the charges having been joined in a single indictment, *see* Fed. R.Crim.P. 8(b), we note, for the sake of completeness, that we expressly find such joinder to have been proper. *See United States v. Cervone,* 907 F.2d 332, 341 (2d Cir.1990) (explaining that joinder is appropriate when "two or more persons' criminal acts are unified by some substantial identity of facts or participants or arise out of a common plan or scheme.") (quoting *United States v. Attanasio,* 870 F.2d 809, 815 (2d Cir.1989)) (internal quotation marks and additional citation omitted). It is well established that conspiracy allegations, such as the five with which all seventeen Defendants are charged in this case can serve as a "common link" justifying joinder of Defendants in a single indictment. *See United States v. Bernstein,* 533 F.2d 775, 789 (2d Cir.1976) ("[J]oinder of a conspiracy count and the substantive counts arising out of the conspiracy is proper since the charge of conspiracy provides a common link and demonstrates the existence of a common plan.") (citations omitted).

of the Defendants' pretrial confinement and the logistical problems caused by the international nature of the Indictment's allegations provide additional reasons for this Court strongly to prefer a joint trial in this case. By the time any trial begins, the Defendants, without being convicted of any crime, will have been detained subject to severely restrictive conditions of confinement for extended periods of time. Any severance would necessarily entail a prolongation of that pretrial detention for some set of Defendants.[8] Moreover, many of the witnesses who will testify at trial live in foreign countries and will have to travel great distances to appear in Court.[9] To force any witness to repeat the ordeal of testifying in this trial under these circumstances is something this Court would prefer to avoid.

Nevertheless, we recognize that this Court should, in the exercise of its discretion,[10] order that the trial of multiple defendants be severed if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933; *accord United States v. Jackson*, 180 F.3d 55, 75 (2d Cir.), *reh'g granted and rev'd on another ground*, 196 F.3d 383 (2d Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 2731, 147 L.Ed.2d 993 (2000); *see also* Fed.R.Crim.P. 14. The moving Defendants, collectively, suggest five reasons they believe such a risk exists, which (with one exception)[11] can be grouped into two broad categories. The moving Defendants contend, *first*, that joinder of those Defen-

---

8. We have carefully considered the possibility of conducting a joint trial before two separate juries, which might provide a type of severance without requiring a prolongation of pretrial detention. This procedure has been tried in several courts. *See, e.g., Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir.1999) (en banc) (collecting cases). Although most appellate courts, it seems, have found the procedure to be constitutionally permissible, many have expressed reservations about its use. *See, e.g., United States v. Lewis*, 716 F.2d 16, 19 (D.C.Cir.1983) (acknowledging warnings about the procedure articulated by state courts) (citations omitted). We find particularly persuasive the qualification expressed by the court in *State v. Corsi*, 86 N.J. 172, 430 A.2d 210, 213 (1981), which recommended that if the procedure is to be used at all, "it should be in relatively uncomplicated situations which will not require the excessive moving of juries in and out of the courtroom. . . ." Because this case is far from being "uncomplicated"—in terms of the number of defendants, witnesses, and lawyers involved; the need for extensive security measures; and the need to translate the proceedings into multiple languages—we believe it would be inappropriate to attempt to conduct a joint trial before two (or more) separate juries.

   We have also considered the possibility of ordering a severance, but referring one set of defendants to a different judge for a simultaneous trial. That possibility is also problematic, however, because of the tremendous publicity this case has engendered. We are not convinced that jurors in each of the trials could be shielded from publicity with respect to the other. Severance and referral for simultaneous trial, therefore, might actually taint the jury's consideration of the evidence even more than in a joint trial, in which any exposure of the jurors to prejudicial information can be more carefully monitored and addressed.

9. The Government anticipates calling "in excess of 100 witnesses from at least six foreign nations." (*See* Govt. Mem. at 14 (citing Affirmation of AUSA Patrick J. Fitzgerald of July 14, 2000, at ¶ 45).)

10. *See Salameh*, 152 F.3d at 115 ("Whether to grant or deny a severance motion is 'committed to the sound discretion of the trial judge.'") (quoting *Casamento*, 887 F.2d at 1149). "The district court's exercise of that discretion is 'virtually unreviewable.'" *Id.* (quoting *United States v. Lasanta*, 978 F.2d 1300, 1306 (2d Cir.1992)).

11. Mr. El Hage's *Bruton* claim does not fall within one of the two categories. We do not address the issue below, however, because the Government has indicated that if its use of Mr. Odeh's statement—to which the claim is addressed—is a decisive reason for ordering a severance, it will refrain from offering the statement at trial. (*See* Govt. Mem. at 39–40.) Any potential *Bruton* problem does not, therefore, figure in our reasoning at this time. The Court will address the adequacy of the Government's proposed redaction in subsequent proceedings.

dants charged only with conspiring to commit the embassy bombings (the "conspiracy-only Defendants") with other Defendants charged both with conspiring to commit the embassy bombings and with substantive offenses arising out of the bombings will cause undue prejudice to the conspiracy-only Defendants. *Second,* the moving Defendants argue that the joinder of those Defendants facing capital punishment (the "capital Defendants") with the Defendants who do not face capital punishment (the "non-capital Defendants") will cause undue prejudice to the non-capital Defendants.

A problem arises, however, because there is not a complete overlap between the set of Defendants facing capital punishment and the set charged with substantive offenses. Defendant Odeh is charged with substantive offenses, but is not facing capital punishment. If the Court were to credit the Defendants' arguments, therefore, three trials would, at a minimum, be necessary—one for the capital Defendants, one for the conspiracy Defendants, and one for Odeh. We note as well that Defendant Salim has insisted that he be tried separately from all of his co-Defendants. If the Court were to comply with his wishes, then, there would be four trials. If the Defendants currently in custody in the United Kingdom are extradited, a fifth trial would, most likely, be necessary. All the while a Defendant or set of Defendants would continue to be subject to highly restrictive pretrial confinement.[12]

The Court is strongly inclined, therefore, for all of these reasons, towards ordering a joint trial of all six Defendants presently in custody. We have carefully considered each of the arguments advanced by the moving Defendants. Because none is sufficiently compelling to overcome our strong preference for a joint trial, the motions are denied.

## I. SEVERANCE OF DEFENDANTS CHARGED WITH SUBSTANTIVE OFFENSES FROM THOSE CHARGED ONLY WITH CONSPIRACY OFFENSES

The moving Defendants' request for a severance from the Defendants charged with substantive offenses rests on the premise that a trial in which the Government alleges only a conspiracy to commit the embassy bombings will differ, in a material way, from one in which both conspiracy and substantive charges are involved.[13] They argue that evidence which, they claim, is admissible in the latter but not in the former will "spillover," in a joint trial, and cause prejudice to those Defendants against whom it is inadmissible. *See United States v. DiNome,* 954 F.2d 839, 843–44 (2d Cir.1992) (explaining how prejudicial spillover can require severance) (citing *United States v. Cervone,* 907 F.2d 332, 341–42 (2d Cir.1990)). Moreover, the moving Defendants suggest that the amount of evidentiary detail required to prove the substantive offenses will introduce a degree of complexity to a joint trial that will unnecessarily prolong and complicate what might otherwise be a relatively

---

**12.** Defendant El Hage's severance motion was predicated on the assumption that, if severed, his trial would precede that of the capital Defendants. He declined to state, however, whether he sought a severance if his trial would follow that of the capital Defendants. (*See* Transcript of 8/2/00, at 7–9.) Of course, the sequence of trials when severance is granted is a matter to be determined by the Court.

**13.** The only concrete example of how the trials would differ is provided by Defendant El Hage, who writes that

[t]he three "non-bombing defendants" would not contest the government's theory with respect to the nature and location of the bombs, and/or their delivery system(s). Thus, in a trial of the "non-bombing defendants" alone, the gory photos and graphic testimony would not have any, much less "substantial," probative value.

(Memorandum of Law in Support of Defendant Wadih El Hage's Pre-Trial Motions to Suppress Certain Evidence, To Dismiss the Indictment, For Severance, and For Other Relief ("El Hage Mem.") at 73.)

streamlined conspiracy trial. *See Casamento*, 887 F.2d at 1149–54 (affirming district court's denial of severance, but noting misgivings about lengthy multi-defendant trials); *United States v. Gallo*, 668 F.Supp. 736 (E.D.N.Y.1987) (granting defense severance motion on ground that joint trial would be unmanageably lengthy and complex).

In support of their premise—that a joint trial will materially differ from severed trials—the moving Defendants label themselves the "non-bombing Defendants," attempting to distinguish themselves thereby from their co-Defendants, whom they call the "bombing Defendants." The distinction, however, fundamentally distorts the Indictment's allegations. Each of the three moving Defendants is charged with conspiring to (1) commit murder, (2) kill United States nationals, (3) use weapons of mass destruction against United States nationals, (4) destroy buildings and property of the United States, and (5) attack United States national defense utilities. (*See* Indictment at ¶¶ 10, 18, 22, 26, 30.)[14] The embassy bombings are said to have been overt acts in furtherance of each of those five conspiracies. (*See id.* at ¶¶ 12aaaaaa–12rrrrrrr, 20, 24, 28, 31.) All of the Defendants—including those only charged with the various conspiracies—are, therefore "bombing" Defendants, and evidence about the bombing is relevant to the Government's case against each of them. *See Salameh*, 152 F.3d at 115 (noting that it is unlikely that prejudicial spillover will exist "when all the defendants are charged under the same conspiracy count") (citations

omitted); *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir.1993) (citations omitted); *United States v. Scarpa*, 913 F.2d 993, 1015 (2d Cir.1990); *United States v. Nersesian*, 824 F.2d 1294, 1304 (2d Cir. 1987); *United States v. Rahman*, 854 F.Supp. 254, 264 (S.D.N.Y.1994) (citations omitted), *aff'd*, 189 F.3d 88 (2d Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 831, 145 L.Ed.2d 699 (2000).

The moving Defendants' argument, therefore, is not that evidence of the embassy bombings is irrelevant against them, but that it is either inadmissible against them or is uncontroverted by them and therefore capable of being resolved by stipulation. Both claims require us to anticipate evidentiary rulings which, due to the procedural posture of the case and the lack of an extensive factual record, are somewhat abstract and hypothetical at this time. *See United States v. Gilbert*, 504 F.Supp. 565, 567 (S.D.N.Y.1980).[15] However, in light of the factual submissions that have been made, and the arguments of counsel, we are persuaded that adequate protections exist, or can be designed, to prevent any undue prejudice to the moving Defendants from being joined for trial with those Defendants charged with substantive offenses.

### A. Prejudicial Spillover

■ The argument that severance is required to prevent prejudicial spillover is based on the assumption that the Government will seek to introduce evidence, in a joint trial, which is admissible against the substantive-offense Defendants but not

---

**14.** Defendants El Hage and Ali Mohamed are also charged with conspiring to murder, kidnap, and maim nationals of the United States at places outside the United States, in violation of 18 U.S.C. § 956(a)(1).

**15.** In this regard we note that "[u]nder rule 14 where a defendant is prejudiced by a joinder of defendants for trial together, the trial judge has a 'continuing duty at all stages of the trial to grant a severance if prejudice does appear.'" *United States v. Rosenwasser*, 550 F.2d 806, 813 (2d Cir.1977) (quoting *Schaffer v. United States*, 362 U.S. 511, 516, 80 S.Ct.

945, 4 L.Ed.2d 921 (1960)) (additional citation omitted); *see United States v. Badalamenti*, 663 F.Supp. 1542, 1543 (S.D.N.Y.1987) (denying severance, but noting that the question would be reopened "throughout as well as after trial"), *aff'd sub. nom., United States v. Casamento*, 887 F.2d 1141 (2d Cir.1989); *but cf. United States v. Glover*, 506 F.2d 291 (2d Cir.1974) (holding that, in certain circumstances, the Double Jeopardy Clause bars reprosecution if severance and mis-trial is ordered after the jury has been empaneled).

against the conspiracy-only Defendants. It is suggested that this circumstance will arise with respect to certain graphic evidence that has been produced in discovery, which depicts the victims of, and physical damage caused by, the embassy bombings ("graphic bombing evidence"). (*See, e.g.,* Declaration of Sam A. Schmidt of June 20, 2000, Exhs. 17, 22, 23 (photographs and videotape containing horrific images of the damage caused by the embassy bombings).)

Although such evidence is plainly relevant to the Government's case against the moving Defendants, it may nevertheless be inadmissible if

> its probative value is substantially outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403. The moving Defendants theorize that the only legitimate probative value of the graphic bombing evidence is to establish, inferentially, certain technical details about the nature and location of the devices used in the embassy bombings. Because the Defendants charged only with conspiring to commit those bombings do not dispute the Government's theories with respect to those details, *see supra* note 13, the probative value of that evidence is, they argue, quite limited with respect to them. As to the substantive Defendants, however,—who, presumably, do dispute the Government's theories regarding the nature and location of the bombs—the graphic bombing evidence would seem to

be of more significant probative value. The Court's Rule 403 balancing analysis would, pursuant to this reasoning, differ therefore with respect to the two classes of Defendants. (*See* Reply Memorandum of Law in Support of Defendant Wadih El Hage's Pre–Trial Motion for Severance ("El Hage Reply") at 4–5.)

The moving Defendants anticipate that the jury will erroneously consider the graphic bombing evidence against them even though it might be inadmissible. They argue that notwithstanding any cautionary instruction this Court might provide, the jurors will simply be unable to compartmentalize the evidence and consider it only against those Defendants as to whom it is admissible and they argue (somewhat differently) that, even if the jurors can compartmentalize the evidence, they will be so inflamed by the graphic bombing evidence that they will ignore what the moving Defendants claim is a relative lack of evidence establishing the existence of, and moving Defendants' participation in, the charged conspiracies. Severance is sought to prevent both forms of this anticipated prejudicial spillover.

We are not convinced, at this stage of the case, that either form of anticipated prejudicial spillover is so likely as to constitute "a serious risk" that the jury will not make "a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. Multi-defendant trials are quite common in the federal system, and many involve evidence that is admissible against one defendant, but not against another.[16]

---

**16.** Although the moving Defendants place great reliance on *United States v. Figueroa,* 618 F.2d 934 (2d Cir.1980), they seem to misunderstand its significance. The court explained that

> [w]hen evidence is offered against one defendant in a joint trial, determination of admissibility against that defendant resolves only the Rule 403 balancing as to him, *i.e.,* that the probative value of the evidence in his "case" is not substantially outweighed by unfair prejudice to him. But if the evidence creates a significant risk of prejudice

to the co-defendants, a further issue arises as to whether the evidence is admissible in a joint trial, even though limited by cautionary instructions to the "case" of a single defendant.

. . . .

> In assessing the risk to a co-defendant of prejudice created by evidence admitted in a joint trial solely against another defendant, the trial court must balance interests somewhat differently than when it makes this assessment in the trial of one defendant. The trial judge must weigh not only the

*See Richardson v. Marsh,* 481 U.S. at 209–10, 107 S.Ct. 1702. Federal courts, quite routinely, have found juries able to follow and abide by appropriate cautionary instructions. *See, e.g., Salameh,* 152 F.3d at 116–17 ("[A]ny possible prejudice was eliminated by the district court's repeated admonitions to the jury that each defendant's guilt had to be separately and individually considered.") (citing *United States v. Hernandez,* 85 F.3d 1023, 1029–30 (2d Cir.1996); *United States v. Losada,* 674 F.2d 167, 171 (2d Cir.1982)). The moving Defendants have presented no reason to believe that the jury in this case will be unusually unable to do so.

We are mindful, of course, that "the gradual accumulation of evidence against the principal members of a conspiracy ..." may in some cases infect a jury's evaluation of the evidence against minor participants. *Gilbert,* 504 F.Supp. at 566 (citing *United States v. Kelly,* 349 F.2d 720 (2d Cir.1965)). But this case does not appear (at least at this stage) to be one in which that danger is likely. All of the Defendants are accused of conspiring to commit extremely violent acts, and of engaging in preparatory conduct to facilitate the destruction of two United States embassies. It is difficult to conceive of how a few evidentiary items that perhaps are inadmissible against one or more defendants will so inflame the jury against those defendants when the jury will already have been told that those defendants are charged with conspiring to commit mass murder. *Cf. Rahman,* 854 F.Supp. at 264 ("[E]ven the least of these defendants is

charged with knowingly agreeing to and ... with actually assisting conduct which, if it had been fully carried out, would have resulted in mass murder. Such a charge makes it particularly difficult to credit claims of prejudicial spillover from evidence of [certain particular violent incidents].").

The Court will make every reasonable effort to insure that no juror considers inadmissible evidence when evaluating whether the Indictment's allegations have been proven beyond a reasonable doubt. If it should appear, during the course of trial, that the jury's consideration of the evidence against a particular defendant will be unavoidably prejudiced by the evidence against another defendant, we will reconsider the feasibility of severance at that time. At this time, however, we are not convinced that a possibility of prejudicial spillover creates a serious risk that the jury, in a joint trial of all six defendants, will be unable to make a reliable determination of each Defendant's guilt or innocence. Severance on that basis is therefore denied.

B. Length and Complexity of Trial

■ The moving Defendants also argue that severance is required because a joint trial will be too long and complex. Whether or not their characterization of the trial proves accurate, their claim would only justify severance if one might expect separate trials to be shorter and less complicated than a joint trial.[17] *See Casamento,* 887

---

probative value and the risk of unfair prejudice to the defendant against whom the evidence is offered, but also the appropriateness of permitting the prosecution to introduce the evidence in a joint trial. Evidence that might be admissible under Rule 403 in a trial of one defendant is not inevitably admissible in a joint trial.

*Id.* at 944–45. By permitting the exclusion of relevant evidence from a joint trial pursuant to Rule 403, even if it is admissible against another defendant, *Figueroa* suggests that evidentiary rulings can be used as an alternative to severance, which would seem to under-

mine the position taken by the moving Defendants.

**17.** This Court has previously considered, and rejected, the claim that the Indictment's allegations are so expansive that they constitute a denial of due process. *See United States v. Bin Laden,* 91 F.Supp.2d 600, 610–12 (S.D.N.Y.2000). In the same opinion, we deferred consideration of Defendant Al-'Owhali's argument that it violated due process to proceed with a joint trial until such time as all severance motions had been fully briefed. *See id.* at 612. For the reasons set forth in this opinion, we find that joinder of all Defen-

F.2d at 1152. The nature of the Indictment's allegations, however, belies that expectation.

Judge Leval's reasoning in *Badalamenti* is instructive. In that case, the Government alleged that the Defendants had participated in a well-organized enterprise that imported heroin. Judge Leval observed that when dealing with allegations of "a broad, large-scale continuing criminal ... enterprise," whose leaders are savvy enough to avoid encounters with undercover agents and fearsome enough to prevent witnesses from cooperating with authorities, "the bulk of the evidence" comes from "laborious, time-consuming surveillance, both visual and electronic." *Badalamenti,* 663 F.Supp. at 1544.

> Almost none of this evidence was incriminating on its face. The surveillance showed only contacts, visits, meetings and occasionally deliveries of packages. The wiretapping revealed conversations so guarded and coded that they were, on their face, incomprehensible. It was only by putting together the voluminous results of such continuous surveillance that the circumstantial evidence fitted together like a crossword puzzle to show that the defendants were involved in a large-scale international conspiracy to import drugs.

> To argue, as the Badalamenti group does, that they have a right not to be subject to a long, complicated trial argues, in effect, that the highest levels of crime have the right to be immune from prosecution if they conduct their criminal affairs in such a manner as not to admit of a simple, rapid trial.

*Id.* at 1544–45. Although, given the procedural posture of this case, we do not yet know whether the Government's evidence was obtained by undercover agents, cooperating witnesses, surveillance, or any other method, the "cell" structure described by the Government, *see supra* at 213, does

seem to require that evidence about each Defendant's activities would be necessary in any trial of any Defendant or group of Defendants. If, for example, a Defendant participated in the charged conspiracies by surveilling an American embassy, it would be necessary and appropriate for the Government to present evidence in his trial about logistical preparations for the bombings and the execution of those bombings in order to explain how the Defendant's conduct was conspiratorial. As in *Badalamenti,* it will be "necessary and proper to introduce a very large part of the evidence of the activities of the other defendants to explain their role in the conspiracy." *Id.* at 1545. There would seem to be little value, in terms of length and complexity, to ordering a severance and conducting separate trials. *See United States v. Millan–Colon,* 834 F.Supp. 78, 81 (S.D.N.Y.1993) (denying severance on ground that evidence of "cohesive heroin distribution organization" would be admissible in separate trials of all defendants).

We recognize that trial of multiple Defendants might, in and of itself, add a degree of complexity to a joint trial that would not exist in a separate trial, even if the evidence presented were the same in both. But it is not a degree of complexity that would render the trial incomprehensible to a jury. The Court has indicated to counsel a desire to focus, before trial, on developing aids to jury comprehension, such as note-taking and photographic arrays (*see* Transcript of 8/2/2000, at 26), which we believe would mitigate the inherent complexity of trying multiple defendants jointly. *See United States v. Abbell,* 926 F.Supp. 1545, 1551 (S.D.Fla.1996) (finding that note-taking, a seating chart, and carefully-drafted instructions can overcome complexities of multi-defendant case). Moreover, we note that at least one of the moving Defendants stresses the dis-

---

dants for trial to be appropriate and we therefore deny Defendant Al-'Owhali's motion to dismiss the Indictment on the ground that it

would violate due process to try the Defendants together.

tinction in time and locale between the conduct with which the conspiracy-only Defendants are accused and the conduct with which the substantive-offense Defendants are accused. (*See* El Hage Mem. at 74.) If so, those distinctions would also tend to reduce the danger of juror confusion, rather than exacerbate it. *See Abbell*, 926 F.Supp. at 1551; *Gilbert*, 504 F.Supp. at 566 (citing *United States v. Papadakis*, 510 F.2d 287, 300 (2d Cir. 1975)).

We conclude, therefore, that a severance would not reduce the length or complexity of the trial in this case in such a way as to aid, significantly, the jury's ability to comprehend the charges and the evidence. Severance on that basis is also denied.

## II. SEVERANCE OF CAPITAL DEFENDANTS FROM NON-CAPITAL DEFENDANTS

The moving Defendants have advanced two unrelated arguments as to why joinder of their trial with that of the capital Defendants creates a serious risk of either a deprivation of a trial right or of the jury being unable to adjudicate guilt or innocence. They argue that trial before a death-qualified jury will cause the non-capital Defendants' to be deprived of their right to an impartial jury, and that the capital Defendants' trial strategy will be antagonistic to their own. Because we find that neither argument has any merit, they are both rejected.

### A. Bias of Death–Qualified Jury

■ The jury-selection process in a capital case differs, in several respects, from the procedure that is used in non-capital cases. Defendants in capital cases, for example, are permitted a greater number of peremptory challenges than are defendants in non-capital cases. *See* Fed. R.Crim.P. 24(b). Perhaps most importantly, the Government is permitted in a capital case to strike for cause any potential

juror whose views about the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *see Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *see also Witherspoon v. Illinois*, 391 U.S. 510, 521–23, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (finding capital jury selection process to be unconstitutional when it permitted the prosecution to strike for cause any juror who expressed qualms about the death penalty). A jury selected in accordance with such procedures is said to be "death-qualified." *Buchanan v. Kentucky*, 483 U.S. 402, 407 n. 6, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987) (citations omitted).

The moving Defendants argue that to force them to be tried before a death-qualified jury will prejudice their right to a trial before an impartial jury. The argument is premised upon the claim that death-qualified juries are more conviction-prone than are other juries. Although the Supreme Court has expressly rejected this legal argument, *see Buchanan v. Kentucky*, 483 U.S. 402, 414–20, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); *see also Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (rejecting similar claim made by capital defendant), the moving Defendants ask us to reconsider the issue, suggesting that sociological research conducted subsequent to *Buchanan* has now more firmly established the factual claim upon which the argument is based. (*See* Letter from James Roth, Esq. to the Court of July 24, 2000, at 1–2.) We decline to do so. In both *Buchanan* and *McCree*, the Court assumed the validity of similar social science research, but found that, even on that assumption, trial before a death-qualified jury did not violate the Constitution's requirement of an impartial jury. *See Buchanan*, 483 U.S. at 415 n. 16, 107 S.Ct. 2906; *McCree*, 476 U.S. at 173, 106 S.Ct. 1758.[18] No reinforcement of

18. We note that we do not read the Court's

assumption for the sake of argument to be, as

the factual claim would alter the legal reasoning articulated by the Court, to which we adhere.

The Defendants also argue that even if trial before a death-qualified jury is not a sufficient ground for ordering a severance, it is a factor which "tips the balance" in favor of severance, given the other considerations addressed above. *See United States v. Rollack,* 64 F.Supp.2d 255 (S.D.N.Y.1999) ("[T]hat a death-qualified jury will be required to try the extensive charges against [the sole capital defendant] further supports defendants' severance motions."); *United States v. Maisonet,* S3 97 Cr. 0817(DC), 1998 WL 355414, 1998 U.S. Dist. LEXIS 9696 (S.D.N.Y. July 1, 1998) ("[T]he inclusion of death penalty-eligible offenses in the indictment further complicates this case, providing additional support for severance."). But here there is no balance to be tipped. We do not find—as did the courts in *Rollack* and *Maisonet*—that the moving Defendants are likely to be prejudiced by a joint trial with a co-Defendant facing the death penalty. *See Rollack,* 64 F.Supp.2d at 257 (noting that capital defendant was charged with "many serious crimes" with which his co-defendants were not charged and that joint trial would therefore prejudice non-capital defendants); *Maisonet,* 1998 WL 355414, 1998 U.S. Dist. LEXIS 9696, at *13–14 (finding that length of trial and danger of spillover prejudice weighed in favor of severance). Moreover, unlike the defendants in *Maisonet,* all of the Defendants in this case are charged with participating in the same five conspiracies. *See Maisonet,* 1998 WL 355414, 1998 U.S. Dist. LEXIS 9696, at *3–4. This case is more similar to *United States v. Heatley,* No. S11 96 Cr. 515(SS), 1998 WL 671462, 1998 U.S. Dist. LEXIS 15167 (S.D.N.Y. Sept. 29, 1998), in which Judge Sotomayor denied severance of a non-capital defen-

dant from a joint trial with a capital defendant, reasoning that there is no "inherent prejudice to noncapital defendants in being tried with capital ones," where the non-capital defendant "is charged with numerous acts of violence" and where the government's evidence would "in the main apply both to the noncapital and capital defendants alike." *Id.* at *4, 1998 WL 671462.

As explained above, we do not find that a joint trial of all six Defendants in custody would create a serious risk that a specific trial right of a Defendant will be violated or would prevent the jury from reliably adjudicating the Defendants' guilt or innocence. That the joint trial will be held before a death-qualified jury does not alter that analysis. *See Heatley,* 1998 WL 671462, 1998 U.S. Dist. LEXIS 15167, at *4 ("[T]here is no reason why the Rule 14 standards . . . should not apply to the noncapital defendants in a capital case.").

## B. Antagonistic Defenses

■ Citing a newspaper article in which counsel for Defendant K.K. Mohamed responded to the Government's decision to seek the death penalty against his client, the Defendants argue that the capital defendants in this case will present a defense that is antagonistic to that of the non-capital defendants. Counsel told the *New York Times,* according to the article, that the Government, in choosing to seek the death penalty against K.K. Mohamed, had

> selected out the lowest member of this conspiracy, the one who probably had the least to do with any planning that these events would occur. He fulfilled essentially a menial role . . . and compared to others who planned this event and made sure that the material and expertise was available to carry it out, his involvement was tiny.

Defendant Ali Mohamed would have it, an acknowledgment that death-qualified juries are conviction-prone. (*See* Ali Mohamed's Memorandum of Law in Support of Motion to Sever at 5–6.) To the contrary, in *McCree,* the

Court prefaced its assumption with an articulation of what it perceived to be "serious problems" with those studies. *McCree,* 476 U.S. at 168–73, 106 S.Ct. 1758.

Benjamin Weiser, *U.S. to Seek Death Penalty for 2nd Defendant in Blasts,* The New York Times, June 14, 2000, at B3. From this single quotation, the moving Defendants infer that the capital Defendants' trial strategy will be to shift blame to the conspiracy Defendants who, allegedly, occupied higher roles in al Qaeda.

Whether that imagined defense would be permissible at the guilt phase of the trial is far from certain. But even if it is permitted, and even assuming that the capital Defendants do present it, we do not believe that defense would be sufficiently antagonistic to the interests of the moving Defendants as to require a severance. In many multi-defendant conspiracy cases, the defendants seek to shift blame to each other. *See Cardascia,* 951 F.2d at 484–85 ("[A]n adversarial stance by a codefendant clearly does not, alone, require trials to be severed. Were this true, a virtual ban on multidefendant conspiracy trials would ensue since co-conspirators raise many different and conflicting defenses."). A severance is only justified [19] if the defenses "conflict to the point of being so irreconcilable as to be mutually exclusive." *Id.* at 484 (citing *United States v. Villegas,* 899 F.2d 1324, 1346 (2d Cir.1990); *United States v. Carpentier,* 689 F.2d 21, 28 (2d Cir.1982); *United States v. Berkowitz,* 662 F.2d at 1134); *see Salameh,* 152 F.3d at 116 ("In order to make a showing of mutually antagonistic or irreconcilable defenses, the defendant must make a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of the other.") (citations omitted). That a defendant claims to be less culpable than a co-defendant does not, even if credited, preclude the acquittal of the co-defendant. Severance on this basis is also denied.

CONCLUSION

For all of the foregoing reasons, as well as the reasons stated in open court on August 2, 2000, the severance motions filed by Defendants Salim, El Hage, and Mohamed are denied. The Court will proceed with a single trial of all six Defendants, before a single jury, on January 3, 2001.

SO ORDERED.

19. The moving Defendants rely on a line of cases that suggest that a severance is required in these circumstances. *See, e.g., United States v. Serpoosh,* 919 F.2d 835 (1990). The Second Circuit has more recently clarified, however, that this line of cases was effectively overruled by *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933, where it was stated that "mutually antag- onistic defenses are not prejudicial per se," and that even when they are prejudicial, "Rule 14 does not require severance," but rather "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *See United States v. Haynes,* 16 F.3d 29, 32 (2d Cir.1994).