UNITED STATES of America

v.

Edward M. GILBERT, John C. Revson
and Ludwig J. Cserhat, Defendants.

No. S80 Cr. 493–CSH.

United States District Court,
S. D. New York.

Dec. 24, 1980.

John S. Martin, Jr., U. S. Atty., for the Southern Dist. of New York, New York City, for the U. S.; Jeffrey E. Livingston, Peter J. Romatowski, Asst. U. S. Attys., New York City, of counsel.

Julien, Schlesinger & Finz, P. C., New York City, for defendant Revson; Stuart A. Schlesinger, New York City, of counsel.

Orans, Elsen, Polstein & Naftalis, New York City, for defendant Cserhat; Gary P. Naftalis, Gary H. Greenberg, Paul E. Summit, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Defendants John C. Revson and Ludwig J. Cserhat move to sever their trials under the captioned indictment from that of defendant Edward M. Gilbert. Rule 14, F.R. Cr.P., whose full text appears in the margin,[1] permits severance of criminal defendants for trial "[i]f it appears that a defendant ... is prejudiced by a joinder of ... defendants in an indictment ... or by such joinder for trial together ..."

The 36-count indictment charges a conspiracy to violate the securities laws, and substantive violations, with respect to manipulation of the shares of Conrac Corporation. All three defendants are named in the conspiracy count, and in substantive counts 33 and 34. Gilbert is charged alone

---

1. Joinder of defendants is permitted by Rule 8(b), which provides:

"Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

Rule 14, captioned "Relief from Prejudicial Joinder," provides:

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial."

in counts 2–8, 9–11, 15, 16, 20, 21, 23, 27–32, and 36. Gilbert is charged together with Revson in counts 17, 22, 24, 25, and 35. Gilbert is charged with Cserhat in counts 12, 13, 18, and 26. Revson is charged alone in count 19, and Cserhat in count 14.

Both Revson and Cserhat contend that they are peripheral defendants who would be prejudiced by a "spillover" from the Government's proof against Gilbert, the main architect of the alleged scheme and, by reason of a prior securities fraud conviction, other legal proceedings, and a much publicized flight to Brazil, a notorious character. Revson and Cserhat argue that much of the Government's evidence in a projected six-week trial will implicate only Gilbert, thereby giving rise to that "slow but inexorable accumulation of evidence of fraudulent practices" by major conspirators which was held to have fatally prejudiced minor participants in *United States v. Kelly*, 349 F.2d 720, 759 (2d Cir. 1965), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). In addition, both defendants claim that they require Gilbert's exculpatory testimony, foreclosed if they are tried together and Gilbert does not take the stand, or purchased at intolerable "spillover" cost if Gilbert testifies and is cross-examined on his checkered past.

*Kelly* undoubtedly teaches that the gradual accumulation of evidence against the principal members of a conspiracy to violate the securities laws may require a separate trial for a minor participant, lately come to the venture. Prejudice is particularly likely to occur in respect of defendants "who are charged in only a few of the many counts" and "who are involved in only a small proportion of the evidence," so that "[t]he jury is subjected to weeks of trial dealing with dozens of incidents of criminal misconduct which do not involve [them] in any way," and "[a]s trial days go by, 'the mounting proof of the guilt of one is likely to affect another.'" *United States v. Branker*, 395 F.2d 881, 888 (2d Cir. 1968), *cert. denied*, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969), quoting *Schaffer v. United States*, 362 U.S. 511, 523, 80 S.Ct.

945, 952, 4 L.Ed.2d 921 (1966) (Douglas, J., dissenting). But severance will be denied where the petitioning defendant's role "was central to the success of the conspiracy, and his overall activity was not so disproportionate to that of his co-defendants that his case needed to be severed to assure that he receive justice." *United States v. Cohen*, 518 F.2d 727, 736 (2d Cir. 1975). When "a continuing, chain-relationship" between all defendants is proven, and "the evidence against the particular defendants who request severance is not 'so little or so vastly disproportionate' in comparison to that admitted against the remainder of the defendants," severance is not required. *United States v. Capra*, 501 F.2d 267, 281 (2d Cir. 1974), quoting *United States v. Rizzo*, 491 F.2d 215, 218 (2d Cir. 1974). In a stock manipulation conspiracy, a defendant is not entitled to severance simply because "he was not a member of the conspiracy during the earlier stages"; where substantial evidence demonstrates his "unlawful participation in the conspiracy," so that he was not a "silent partner" or a "peripheral defendant," a joint trial is proper. *United States v. Corr*, 543 F.2d 1042, 1052 (2d Cir. 1976). The defendant requesting severance must show substantial prejudice resulting from joinder, not just that he would have a better chance for acquittal at a separate trial. *United States v. Lyles*, 593 F.2d 182, 189–90 (2d Cir. 1979). A relatively brief trial of a one-count indictment militates against severance, since there is better chance that the trial judge's cautionary instructions will suffice, *Lyles* at 190. The danger of prejudicial spillover is also reduced, lessening the need for severance, where a particular defendant's circumstances are markedly different from his co-defendants. *United States v. Papadakis*, 510 F.2d 287, 300 (2d Cir. 1975) (drug purchaser tried together with police officers who illicitly sold confiscated narcotics; "[w]e cannot ascribe such a spillover [of evidence unrelated to purchaser] to the joint trial for the very reason that Papadakis was obviously not a 'crooked cop' and clearly had no connection with their corrupt activities").

In addition to the spillover factor, Revson and Cserhat stress their need for Gilbert's exculpatory testimony. In evaluating that contention, the pertinent criteria include "(1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege, . . . (2) the degree to which the exculpatory testimony would be cumulative, . . . (3) the counter arguments of judicial economy, . . . and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment ·..." *United States v. Finkelstein*, 526 F.2d 517, 523–24 (2d Cir. 1975) (citations omitted). Circumstances warranting severance are illustrated by *United States v. DePalma*, 446 F.Supp. 920 (S.D.N.Y.1979).

■ The perspectives of the trial and appellate courts on severance are different. Where a connected defendant appeals from the trial court's refusal to sever, the appellate court's inquiry is whether the trial judge abused his discretion; and it addresses that question against the background of a full trial record. By definition, the trial judge confronted with a pre-trial motion to sever a defendant has no such record. Accordingly the moving defendant must make the requisite showing of substantial prejudice from other sources; and the trial court's evaluation of risk is limited by the information then available to him.[2]

Revson and Cserhat both contend, in their moving papers, that they were innocent at best and merely peripheral at worst. The Government portrays them as central figures in the conspiracy, essential to its success. These characterizations of advocates, predictable enough when severance is sought and resisted, give me minimal assistance. But there are other sources from which pertinent information may be gleaned. In 1975, the Securities and Exchange Commission ("SEC") commenced an investigation into the alleged manipulations of Conrac stock. A number of individuals testified before the SEC in connection with that investigation. They included Gilbert

and one James C. Couri, an unindicted co-conspirator in the present case who is expected to be a principal Government witness. Pertinent sections of Gilbert's and Couri's SEC testimony are attached to the motion papers. In addition, the SEC culminated its investigation with a civil action seeking injunctive relief against Gilbert, Couri, Revson, Cserhat, and other individuals and entities. *Securities and Exchange Commission v. Gilbert, et al*, 82 F.R.D. 723, S.D.N.Y. (IBW). The affidavit of Steven Glusband, the SEC attorney in charge of the investigation, dated January 21, 1976 and presented to Judge Wyatt in support of the SEC's motion for a preliminary injunction, comprises 36 pages and contains 166 paragraphs. The Glusband affidavit, attached to the Revson's motion, presents in detail the SEC's perception of the scheme and its participants at the time civil injunctive relief was sought. These are sources, existing independently of the present contentions of counsel, which I may consult in determining whether severance is required in this case.

I should emphasize that in this opinion I intimate no view upon the accuracy of the SEC's account. Nor do I hold any opinion as to the guilt or innocence of any defendant of the crimes now charged. That determination is for the jury. The sole purpose of the recitation below is to demonstrate the SEC's prior perception of the case.

For reasons that will appear, the following analysis centers upon Revson.

The Glusband affidavit (hereinafter "G.A.") recites that beginning "in the last quarter of 1974, Gilbert, in his own accounts, accounts in which he had a beneficial interest, accounts of persons acting at his direction, and accounts of persons to whom he lent money to purchase Conrac, began to purchase and sell shares of Conrac in large volume." These entities are referred to as the "Gilbert group." By May, 1975, the "Gilbert group" had accumulated 75,000 Conrac shares, out of a total number of outstanding shares of slightly less than

2. Of course, the trial judge may sever a defendant during the course of trial if the necessity to do so is manifested by the testimony. *Kelly, supra*, at 756.

1,300,000. The Gilbert group operated out of approximately 25 accounts at two brokerage firms. During this period of accumulation, the price of Conrac rose from approximately $9 to $20 per share. The Gilbert group continued its acquisition activities through September, 1975, holding a total of 98,000 shares at the end of that month. The positions in Conrac of the "Gilbert related accounts" for the period May-September 1975 appear in G.A. ¶ 27. Revson was not yet involved. Neither was Couri.

G.A., Part V, at ¶ 29, is captioned: "The Entry of Couri." Couri was an investor. Gilbert had met him earlier in 1975. On or about September 24, 1975, Gilbert proposed that Couri become active in the purchase and sale of Conrac shares. Couri agreed to do so, utilizing at times funds advanced to him by Gilbert. G.A. ¶¶ 29–31. It is apparent from the SEC investigation, and the Glusband affidavit summarizing its results, that Couri acted under the direct supervision of Gilbert in his Conrac trading, moving into Gilbert's own office. A typical statement appears in G.A. ¶ 30, which after describing Couri's first Conrac transaction at Gilbert's instigation, states:

> "In connection with this purchase and nearly all other transactions executed subsequently by Couri for his own accounts and those of Revson, Gilbert directed Couri as to when to purchase or sell Conrac shares, what amounts to purchase or sell the shares for, *and the price* at which the transaction should be effected." (emphasis in original).

Revson had been associated with Couri in 1969, as a partner in investment firms of which Couri was managing partner. These partnerships ceased operations in 1969. In August, 1975, Revson inherited a large sum of money and a substantial amount of Revlon stock. Revson was interested in finding an attractive investment. While, following the dissolution of the 1969 partnerships, Revson had no significant contact with Couri, on or about October 8, 1975 Revson received a telephone call from Couri, concerning an alleged indebtedness in connection with the dissolution of one of the 1969 partnerships.[3]

Couri described his October 8, 1975 telephone call with Revson in his testimony before the SEC. Couri testified as follows:

> "He [Revson] says, 'Oh, by the way,' he says, 'I understand from Irving that you are doing very well in the market and that you are friendly with Eddie Gilbert. I understand that you made some money in Milgo.'
>
> "I said, 'Yes, all those three things are true.'
>
> "He said, 'Well, what are you buying now?'
>
> "I said, 'Well, I'm buying Conrac. I have just recently bought Conrac.'
>
> "His next question is what do they do?
>
> "And I told him.
>
> "He said, 'Well, what is Eddie Gilbert's involvement?'
>
> "I said, 'Well, he has got a lot of stock' and I don't remember, he made some kind of an offhanded comment about Eddie, in other words, he is a mover or wheeler dealer, or something like that.'"

Following that exchange, Revson expressed an interest in buying 5,000 Conrac shares, and Couri agreed to handle the order for him. Couri immediately telephoned Gilbert; thus Couri told the SEC:

> "Now, with that, when I hung up from John, which was right by the poolside at the New York AC, I immediately called Eddie Gilbert to let him know that John Revson was going to buy or told me to buy this 5,000 shares.
>
> "He was elated about it and said, 'Look, I will tell you what you better do. Why don't you come directly to the office tomorrow to my office' the following morning, "And we will sit down and plan out what, you know, is to be done.'

---

**3.** The recitation in this paragraph is based upon Revson's affidavit of February 12, 1976, in the SEC action, at ¶¶ 4–6. I do not accept Revson's averments, either in that affidavit or in this motion, at face value. But these particular assertions are corroborated by Couri's testimony before the SEC, as appears in the text immediately following.

"I said, 'Okay.' "

The SEC's summary of these events appears in G.A. ¶¶ 33 and 34:

"33. On the same date Couri spoke with Revson on the telephone. After Couri told Revson he was buying Conrac, Revson asked Couri to purchase 5,000 shares of Conrac on his behalf. An agreement was reached wherein Couri would open a brokerage account for Revson and Couri would be given a power-of-attorney authorizing him to buy and sell securities on behalf of Revson. Couri was given similar powers to effect transactions for Revson at all the subsequent broker-dealers wherein Revson opened brokerage accounts.

"34. Immediately following the conversation with Revson, Couri called Gilbert to inform him of Revson's order. Gilbert instructed Couri to meet him at his office the following day to plan out the purchases of Revson."

The picture which thereafter emerges from the Glusband affidavit is one of Gilbert masterminding Conrac purchases and sales, Couri acting to implement Gilbert's instructions. When Revson's funds were to be implicated, Couri used the power of attorney which Revson had given him. It is not necessary to describe each transaction in detail. Typical allegations from the Glusband affidavit are set out in the margin.[4] On at least one occasion, the SEC acknowledged that Gilbert and Couri were concealing the genuine nature of the transaction from Revson: "Thus, although Revson believed he was purchasing Gilbert's 8,500 shares, in fact he was purchasing approximately 3,000 of the shares being held by Couri." G.A. ¶ 81.

It further appears from the SEC papers that Revson met Gilbert only twice. According to Couri's testimony before the SEC, after the first few transactions involving Revson, when Revson had acquired about 16,000 Conrac shares, Couri arranged a meeting between Revson and Gilbert at the latter's office, in response to Revson's repeated requests. At that meeting, Couri testified, Gilbert praised Conrac as an investment, asked how many additional shares Revson could purchase, and said he would guarantee Revson against any loss, while assuring him of profits. As a result of that conversation, Couri testified to the SEC, Revson agreed to purchase additional Conrac shares. The second meeting between Revson and Gilbert took place in the evening, at Gilbert's home, again at Revson's request. The first meeting, at Gilbert's office, occurred on or about October 28, 1975, G.A. ¶ 40; the second meeting at Gilbert's apartment, involving Revson, Gilbert and Couri, during the week of November 4. *Id.* at ¶ 63. At the second meeting, the SEC alleged that Gilbert urged Revson to buy shares in another company, Western Co. of North America, and that Revson agreed to do so, Gilbert having told Revson he would indemnify him against

---

4. G.A. ¶¶ 93–96 recites:

"93. At about that time Conrac was selling at approximately $28 per share. Gilbert instructed Couri to place orders for the purchase of 800 shares for Revson's account in order to raise the price of Conrac to around $29 before the block was traded.

"94. Acting on Gilbert's instructions, Couri placed orders for Revson's account at L.T. Securities, Inc. ("L.T."), a registered broker-dealer which clears through Moore & Schley, Cameron & Co., in the following order:

1. 100 shares at $28¼;
2. 400 shares at $28½; and
3. 300 shares at $28¾.

"95. When the price for Conrac reached $28¾, Couri instructed his account executive at L.T. to cross at the firm 6,400 shares of Conrac between his account and Revson's account at $28⅞. He then told his account executive that Bache & co. would be the seller of 17,800 shares on the trading floor of the NYSE at $28⅞.

"96. Bache, acting for Couri, sold the 17,800 shares to Revson. This entire series of transactions was directed by Gilbert."

¶ 116, speaking of a later transaction, says: "119. Gilbert instructed Cserhat to sell 8,500 shares for Revson and instructed Couri to bid for 7,500 shares. After this transaction was effected, Couri, acting on the instructions of Gilbert, caused his and Revson's account executive at Bache to sell 20,500 shares at $23⅜ for Revson's account, and caused his account executive at Paine Webber, Jackson & Curtis Inc. ("Paine Webber"), a registered broker-dealer, to buy these shares for his account."

loss. G.A. ¶¶ 63–66. Gilbert, in his testimony before the SEC, expressed annoyance with Revson's request for a late-evening meeting; Gilbert said of Revson:

"He said he'd be there at 10, and came 11:30, and I was really upset, and I was tired. I wanted to go to sleep. And he came in. He's very irresponsible as far as time is concerned from what I understand from Couri. I don't know the man. I met him twice in my life." Tr. 76–77.

In a section of the Glusband affidavit captioned "The Bubble Begins to Burst," the SEC describes the pressures engendered by Couri's need for cash to finance some of his Conrac purchases. G.A. ¶¶ 108–114. Gilbert was also coming under pressure, and at one point rebuffed Couri's effort to sell him 25,000 shares "because he [Gilbert] had heard from Cserhat that 'the SEC is sniffing around.'" G.A. ¶¶ 90–91. On December 15, 1975, Gilbert flew to Cleveland, and called Couri from that city to give the latter further instructions with respect to the purchase and sale of Conrac shares. Gilbert hoped that a Swiss banker, coming to New York that week, could be persuaded to purchase Conrac shares. G.A. ¶¶ 131–132. Couri, in his SEC testimony, described Gilbert's telephone call to him from Cleveland as follows:

"Eddie called me from Cleveland and it was, I think, just about a half hour before the market closed, and maybe an hour before the market closed, and I said, 'Eddie, you know, I can't take this anymore. I mean, I'm getting way over my head here.' He said, You do what I tell you. You better make sure that I sell the stock before it closes. I got to sell this stock. Call up this one or that one.' You know—I was really losing my mind. At that particular time, poor Revson, he was losing his mind. He didn't know which way he was going. I didn't know where I was going. I was so mixed up that I was just fit to be tied, but I remember he kept insisting on the phone, long distance, 'You better get those orders in.' I got to sell that stock today.'"

The Conrac situation was now in its final throes. Conversations on December 16, 1975 at Gilbert's office between Gilbert, Couri and the "Swiss banker," one Theodor Arnold, gave rise to further suggested structures by which Conrac shares might be purchased and sold, G.A. ¶¶ 140–151; but on December 17, Couri and Revson were requested by their broker, Paine Webber, to pay in full for the Conrac shares they held in their margin accounts. To meet the broker's demands, Revson delivered the shares he held at Paine Webber to a bank. Couri could not arrange for the payments of funds to Paine Webber, and instructed the firm to find a purchaser for the shares. When the order to sell out Couri's entire Conrac position of about 18,000 shares reached the floor of the New York Stock Exchange, on December 19, trading in Conrac was halted. The stock had dropped 5⅛ points in two days. At the time of the halt, Couri held about 120,000 Conrac shares in his numerous accounts. The SEC ordered the suspension of trading in Conrac shares on December 31, 1975. G.A. ¶¶ 152–159. The SEC alleged that during December, 1975, 291,000 shares of Conrac traded on the New York Stock Exchange, adding that: "The 'Gilbert group' and the Couri-Revson sub-group accounted for 189,000 of the total purchases, or 64.8% of the volume." As noted *supra*, Revson was not a member of the "Gilbert group." December 18, 1975 was the last day that Conrac was traded. On that date, Couri held 120,600 shares, Revson held 74,000 shares, and the "Gilbert group" held 44,350 shares. G.A. ¶¶ 160–162.

One finds, in the SEC civil presentation and the testimony upon which it was based, much that is consistent with Revson's self-characterization as an innocent dupe. To be sure, the individuals testifying before the SEC were interested in exculpating themselves, and, by logical extension, those with whom they were in contact. But it is fair to say that, in the Glusband affidavit seeking injunctive relief, the SEC put its best foot forward in respect of the complicity of all the individuals involved. And the fact is that repeatedly the Glusband affidavit stops short of alleging that Revson knew

about the considerations underlying the manipulations of Gilbert and Couri. Thus the SEC presentation lends some inferential support to Revson's present contention that he lacked that *mens rea* necessary to sustain a criminal charge.[5] In any event, there appears to be no dispute that Revson did not become implicated in the Conrac trading until the alleged conspiracy, masterminded by Gilbert, had been in operation for a year; that Revson's involvement covered only the last two months of the scheme; that his involvement with Gilbert was entirely fortuitous as far as the latter was concerned, Revson in effect dropping out of the sky as the result of his prior association with Couri; and that Couri was in a position, through the powers of attorney given him by Revson, to manipulate Revson's holdings without the latter's full awareness of what was taking place. Whatever Couri's efforts to exculpate himself may have been, his reference to Revson in his account of Gilbert's December 15 telephone call from Cleveland—"At that particular time, poor Revson, he was losing his mind. He didn't know which way he was going"—has the ring of plausibility.

Again, that is not to say that I have formed any judgment as to Revson's guilt or innocence of the charges contained in the indictment. In the event of trial, the jury will make that determination, from the evidence or lack of evidence. But I do conclude that, in the light of the authorities cited *supra*, the trial of Revson must be severed from that of Gilbert. Revson has made a sufficient showing of disproportionate involvement in the overall scheme to raise a substantial risk that he would be prejudiced by the gradually accumulating effect of evidence of Gilbert's wrongdoing, at times long before Revson began to purchase Conrac, and in connection with transactions where Revson played no part, or where his involvement was directed by others without full disclosure to Revson. Furthermore, unlike the drug purchaser in *Papadakis, supra,* Revson is not readily distinguishable, in character or the nature of his involvement, from Gilbert. A jury would have no difficulty in distinguishing between corrupt police officers selling drugs, and the trafficker who purchases them. The risk in the case at bar is that a jury, considering volumes of evidence with respect to investors or dealers in a company's stock, may tend to associate all investors with the wrongdoing of the architect of the scheme. In my judgment, the risk of prejudicial spillover in respect of Revson, charged in relatively few counts of a complex indictment, is unacceptable.[6]

As an alternative basis for severance, Revson asserts his need for exculpatory testimony from Gilbert. It is said that the availability of Gilbert as a defense witness for Revson would be enhanced by severance, and the trial of Gilbert first. A pertinent factor under the Second Circuit's decision in *Finkelstein, supra,* is "the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege," 526 F.2d at 523. In the case at bar, Gilbert has declined to give an affidavit of willingness so to testify, of the sort upon which Judge Sweet relied in granting the severance in *DePalma, supra.* Although a difference

---

**5.** The Glusband affidavit does charge Revson with backdating letters which revoked the powers of attorney he gave to Couri, ¶¶ 123–124, in an effort to disguise the fact that Revson had acquired a reportable interest in Conrac under 15 U.S.C. §§ 78m(d), 78ff, and Rule 13d–1, 17 C.F.R. § 240.13d–1. Revson is charged with that failure to report in count 35 of the indictment, together with Gilbert as an aider and abettor. The backdating of letters is not always associated with a state of total innocence, and Revson does not treat this incident, either in his self-exculpatory affidavit before the SEC

or his present motion. But the resulting alleged offense is discrete and separate from the others charged in the indictment.

**6.** Because the circumstances requiring severance appear with sufficient clarity at this preliminary stage, it is better to sever the defendants now, rather than require them to incur the effort and expense of participating in a joint trial, only to lose "the attendant likelihood that a severance will then be required to avoid prejudicial error." *Gleason, supra,* at 285.

panel of the Second Circuit has said that *Finkelstein* "requires" a showing that the co-defendant would waive his Fifth Amendment privilege at a severed trial, *United States v. Taylor*, 562 F.2d 1345, 1362 (2d Cir. 1977), cert. denied, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977), it is by no means clear that a *DePalma*-type affidavit is a condition precedent to severance for the purpose of obtaining a co-defendant's exculpatory testimony. The *Finkelstein* court itself said:

> "In the instant case there was no indication that anyone intended to plead guilty, and, consequently, privilege complications would have been eliminated only if there had been *four* separate trials with Segal's having been first, followed by Finkelstein's, Zuber's and Scardino's." *Id.* at 525 (emphasis in original).

Implicit in this discussion is a recognition that the resolution of the co-defendant's severed trial might eliminate the basis for any subsequent assertion of the Fifth Amendment privilege. That consideration occurred to Judge Frankel when he directed severance in *United States v. Gleason*, 259 F.Supp. 282, 284 (S.D.N.Y.1966):

> "If Pitkin is tried separately and first, he may plead, or be found, guilty. He may choose to testify in his own defense. He may, as the law presumes, be acquitted, whether or not he takes the stand. One way or another, it is possible that he will come to lack a subsequent basis for invoking the privilege."

Cf. *United States v. Esposito*, 423 F.Supp. 908, 911 (S.D.N.Y.1976), in which Judge Weinfeld, denying a motion for severance, stated that "[t]here is no indication that Steinberg and Rizzo, if called at a severed trial, would waive their Fifth Amendment rights and testify," going on to observe that these co-defendants "even after a separate trial, may be entitled to assert their Fifth Amendment rights when called upon to testify by Iannone and Albahari," *id.* at 911, citing *Finkelstein* for the latter proposition.

In my judgment, there is much to be said for the criterion applied by Judge Frankel in *Gleason*, namely, "that there is a substantially greater likelihood" of the co-defendant's evidence being available if the trials are severed, even if the motion does not establish that availability to a certainty. 259 F.Supp. at 285. There is authority in other circuits for the proposition that the availability of a severed co-defendant's testimony need not be demonstrated with certainty, *United States v. Shuford*, 454 F.2d 772, 778 (4th Cir. 1971); *United States v. Echeles*, 352 F.2d 892, 898 (7th Cir. 1965); and my reading of *Finkelstein* does not indicate a foreclosing of the analysis adopted in *Gleason*.

The exculpatory nature of Gilbert's sought-after testimony, *vis-a-vis*, lies in Gilbert's testimony before the SEC, quoted *supra*, that he really did not know Revson at all, and had met him only twice. Arguably, that is inconsistent with the Government's portrayal of Gilbert and Revson working together as co-conspirators in an elaborate stock manipulation. Revson would also be hopeful, presumably, of eliciting from Gilbert testimony that, whatever the true nature of the underlying transactions may have been, Revson was kept substantially in the dark.[7]

As for Cserhat, his motion papers portray him as nothing more than a broker, one of several whom Gilbert utilized, and who executed Conrac purchase and sale orders without any knowledge of the alleged underlying manipulative scheme. It is common ground that there were far more direct contacts between Gilbert and Cserhat than between Gilbert and Revson; but Cserhat stresses the need for Gilbert's non-cumulative, exculpatory testimony: "There is one witness and one witness only who can testify that Couri is lying or mistaken about

---

7. While the potential availability of Gilbert as an exculpatory witness for Revson lends weight to the latter's motion for severance, the spillover threat discussed *supra* would require severance in any event.

what Gilbert allegedly said to him [Cserhat], and that witness is Gilbert." Brief at p. 33.

I need not consider Cserhat's position as closely as that of Revson. For the reasons indicated, I have determined that the trial of Revson must be severed. In consequence, there must be at least two trials. That being so, it requires no further analysis to demonstrate that it is Gilbert who should be tried alone, and first in time. No basis exists for separate trials of all three defendants.

For the foregoing reasons, the trial of defendant Gilbert is severed from the trial of defendants Revson and Cserhat, who will be tried together upon completion of the Gilbert trial. Unless Gilbert's pending motions addressed to the indictment require a different result, his trial will begin on January 12, 1981 as presently scheduled. Further scheduling will be arranged with respect to Revson and Cserhat, and the Court at that time will make appropriate findings under the Speedy Trial Act.

No view is intimated with respect to the other motions pending on behalf of all defendants. Those motions will be addressed in separate opinions. I have endeavored to deal with the severance motions sufficiently far in advance of the trial date to assist the Government, defendants, and counsel in arranging their personal schedules.

The motion for severance is granted, to the extent reflected in this opinion.

It is So Ordered.