**UNITED STATES,**

v.

**John J. RIGAS, Timothy J. Rigas, Michael J. Rigas, and Michael C. Mulcahey, Defendants.**

**No. 02 CR. 1236(LBS).**

United States District Court, S.D. New York.

Aug. 11, 2003.

---

Paul R. Grand, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, for Timothy Rigas.

Andrew J. Levander, Swidler, Berlin, Shereff, Friedman, LLP, New York City, for Michael Rigas.

Mark J. Mahoney, Harrington & Mahoney, Buffalo, NY, for Michael Mulcahey.

### MEMORANDUM AND ORDER

SAND, District Judge.

Defendants John Rigas, Timothy Rigas, Michael Rigas, and Michael Mulcahey ("Defendants") make multiple motions attacking the sufficiency of the indictment in this case ("Indictment"). Michael Rigas and John Rigas also move for an order severing their trials from that of their codefendants. For the reasons set forth below, the motions are denied.

### BACKGROUND

The Indictment charges Defendants with one count of conspiracy and 22 counts of securities fraud, wire fraud, and bank fraud in connection with the control and management of the Adelphia Communications Corporation ("Adelphia").[1] The Court's previous Memorandum and Order set forth in general the government's factual allegations, and familiarity with that decision is presumed. *United States v. Rigas*, 258 F.Supp.2d 299 (S.D.N.Y.2003).

In April 2003, Defendants brought a variety of motions challenging alleged deficiencies in the Indictment and requesting an order for severance of the trial. The motions are as follows: Defendants by joint motion seek an order (1) requiring the government to elect among alleged multiplicitous counts in the Indictment (Counts Two through Sixteen), (2) striking alleged prejudicial surplusage from the In-

Christopher J. Clark, Timothy J. Coleman, Judd C. Lawler, United States Attorneys Office–Southern District of New York, New York City, for the United States.

Peter Fleming, Jr., Curtis, Mallet–Prevost, Colt & Mosle LLP, New York City, for Defendant John Rigas.

---

**1.** The government returned a superceding Indictment in this case on July 30, 2003. Unless otherwise noted, all references are to the superceding Indictment.

dictment, and (3) striking references to alleged breaches of the duty of honest services. Michael Rigas seeks an order (1) dismissing Count One (Conspiracy), Counts Seventeen through Twenty–One (Wire Fraud), and Counts Twenty–Two and Twenty–Three (Bank Fraud) on grounds that shall be described below; [2] and (2) on behalf of himself, severing his trial from that of his codefendants. John Rigas, on behalf of himself, also seeks an order severing his trial from that of his codefendants. Finally, Michael Mulcahey, on behalf of himself, seeks an order dismissing all counts in the Indictment, except for any charges resting entirely on certain specified paragraphs in the Indictment, and striking surplusage from the Indictment.

The Court held oral argument on May 21, 2003 at which the government agreed to strike Count Ten of the original Indictment as erroneously duplicating Count Eight of the original Indictment. (Tr. of Oral Arg. of 5/21/03 ("Tr.") 27.) On May 29, 2003, the government informed the Court of its intention to ask the grand jury to return a superseding indictment in this case. The superceding Indictment was returned on July 30, 2003. It reflects the government's agreement to strike Count Ten and makes other changes, which, when relevant, are described below.

Two motions may be considered summarily. First, the Court denies Defendants' joint motion to strike prejudicial surplusage without prejudice to renewal after the government provides a final bill of particulars. (*See* Tr. 30–31.) Second, in agreement with the government's position (Gov't Memo. in Opp. ("Opp.Memo.") 25–26), the motion to dismiss Count One and Counts Seventeen through Twenty–One of the Indictment to the extent that they rely on a duty of honest services is denied without prejudice to renewal given

the Second Circuit's current *en banc* consideration of the constitutionality of 18 U.S.C. § 1346. *See United States v. Rybicki*, 287 F.3d 257 (2d Cir.2002).

## DISCUSSION

### A. *Motion to Dismiss Count One (Conspiracy)*

Count One of the Indictment charges conspiracy to commit securities fraud, wire fraud, false statements in SEC filings, false books and records, and bank fraud. (Indictment ¶¶ 198–203.) As noted in this Court's previous opinion, Count One outlines in considerable detail a scheme to manipulate and conceal Adelphia's perilous financial condition from 1999 to 2002 ("Adelphia Scheme"). *Rigas*, 258 F.Supp.2d at 301–03. Pursuant to Federal Rules of Criminal Procedure 8(a) and 12(b), Michael Rigas moves to dismiss this Count as duplicitous.

■ "An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed.R.Crim.P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir.2001). To avoid the problem of duplicity, an indictment may not charge multiple conspiracies in a single count. *E.g., United States v. Murray*, 618 F.2d 892, 896–97 (2d Cir. 1980).

■ Michael Rigas argues that Count One runs afoul of this prohibition by encompassing at least six separate and distinct conspiracies. The Court is not persuaded. "A conspiracy involves an agreement by at least two parties to achieve a particular illegal end." *United States v. LaSpina*, 299 F.3d 165, 174 (2d Cir.2002). "In order to prove a single

---

**2.** Unless otherwise noted, all Defendants join in the motions brought by Michael Rigas.

conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal. The co-conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir.2001) (internal quotations omitted). As the agreement, not the commission of the substantive crime, is the essence of the conspiracy, *United States v. Gore*, 154 F.3d 34, 40 (2d Cir.1998), a single conspiracy may include multiple groups of people, and the pursuit of multiple illegal objects does not automatically divide a single conspiracy into multiple conspiracies. *United States v. Berger*, 224 F.3d 107, 115 (2d Cir.2000); *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir.1992); *see also United States v. Trippe*, 171 F.Supp.2d 230, 238 (S.D.N.Y.2001) ("[I]t is firmly established in this Circuit that an indictment count may allege a conspiracy to commit multiple crimes."). Generally, whether a single conspiracy or multiple conspiracies existed is a question of fact for the jury. *E.g.*, *Berger*, 224 F.3d at 114.

■ Here, on its face Count One charges the central players in Adelphia's corporate affairs with a single conspiracy to defraud Adelphia creditors and investors by concealing Adelphia's perilous financial condition and its alleged improper business relationships with the Rigas family and separate businesses controlled by the Rigas family. The Indictment describes, for example, Defendants' attempt to misrepresent the actual state of Adelphia's liabilities on its financial statements (Indictment ¶¶ 64–73) while at the same time concealing the true extent of Adelphia's growing debt burden through false press releases and false entries in Adelphia's books and records (Indictment ¶¶ 73–81), and misrepresentations to Moody's Investors Service. (Indictment ¶¶ 82–91.)

The Indictment alleges a similar strategy of misrepresentations and concealment regarding Adelphia's earnings (Indictment ¶¶ 92–126) and operating results, including the number of basic cable (Indictment ¶¶ 127–38) and high-speed Internet subscribers. (Indictment ¶¶ 139–42.) Despite the effects on various persons and entities, and the uses of various media, Count One adequately connects these activities to a single scheme designed to ensure that Adelphia's declining financial health–and the Rigas family's involvement in such decline–would remain concealed. Although not all Defendants are individually implicated in every fraudulent act, the identification of various overt acts and different substantive crimes involving only some Defendants does not automatically transform a single overarching scheme into a series of separate conspiracies. *See Aracri*, 968 F.2d at 1518 (noting that separate criminal acts may be charged in a single count if they are part of "a single continuing scheme"); *United States v. Maldonado–Rivera*, 922 F.2d 934, 963 (2d Cir.1990) ("[A] single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance."). Thus, the allegations in Count One avoid the risk of duplicity, and it will be the jury's task to decide the further factual question of whether a single conspiracy or multiple conspiracies exist. Michael Rigas's motion to dismiss Count One is denied.

B. *Motion to Dismiss Counts Two Through Sixteen (Securities Fraud)*

Counts Two through Sixteen of the Indictment charge Defendants with securities fraud in connection with the sale or purchase of several Adelphia securities. These Counts incorporate the previous allegations in ¶¶ 1–197 and 204–05 of the

Indictment; repeat, in substantial part, the text of Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission (SEC) Rule 10b–5; and list 15 classes of Adelphia securities, each of which forms a separate count. Defendants argue that Counts Two through Sixteen are multiplicitous, and they seek an order requiring the government to elect one count on which to proceed and to dismiss the remaining counts.

■■■ "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko,* 169 F.3d 140, 145 (2d Cir.1999). A multiplicitous indictment is impermissible because it charges a person with the same offense more than once, in violation of the Double Jeopardy Clause. *Id.* It also risks prejudicing the jury by suggesting that "defendant committed not one but several crimes." *United States v. Reed,* 639 F.2d 896, 904 (2d Cir.1981); *see also* 1A Charles Alan Wright, *Federal Practice and Procedure* § 142 n. 19 (3d ed.1999).

■■■ For purposes of a multiplicity analysis, the determinative issue is not whether the same conduct underlies separate counts, but whether the offense charged in one count is the same as the offense charged in another count. *Chacko,* 169 F.3d at 146. When conduct is alleged to have violated the same statute multiple times, as in the present case, the relevant question–one of statutory interpretation–is identification of the "unit of prosecution" established by the statute. *United States v. Handakas,* 286 F.3d 92, 98 (2d Cir.2002) (citing *Bell v. United States,* 349 U.S. 81, 82–83, 75 S.Ct. 620, 99 L.Ed. 905 (1955)).

The analysis begins with the language of the statute and rule at issue. Section 10(b) provides in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (2000).

Rule 10b–5, which implements Section 10(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (2003).

■■■ By its terms, Section 10(b) prohibits using any manipulative or deceptive device in connection with the purchase or sale of any security in contravention of

rules prescribed by the SEC. *United States v. O'Hagan,* 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). As further defined by Rule 10b–5, which is coextensive with Section 10(b), *SEC v. Zandford,* 535 U.S. 813, 816 n. 1, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002), the forbidden act may take the form of a fraudulent scheme, a false statement of material fact or material omission, or a fraudulent act or practice. Section 10(b) and Rule 10b–5, then, forbid not only fraudulent schemes, but other fraudulent activities that are connected to the purchase or sale of any security, which may be generally described as "transactions." *See United States v. Dioguardi,* 492 F.2d 70, 83 (2d Cir.1974) ("[E]ach transaction in a securities fraud case constitutes a separate offense."). Therefore, multiplicity principles do not require, in every case, that the separate counts of an indictment charge separate and discrete securities fraud schemes. *Cf. United States v. Haddy,* 134 F.3d 542, 549 (3d Cir.1998) (stating that, on the facts presented, the indictment properly charged discrete schemes to manipulate the securities of three separate companies, but declining to dictate an inflexible rule regarding the allowable unit of prosecution in a securities fraud case). Rather, fraudulent transactions involving different securities, even if made with the intent of furthering a single overall conspiracy, may establish the basis for separate counts of an indictment under Section 10(b) and Rule 10b–5. *See United States v. Langford,* 946 F.2d 798, 803 (11th Cir.1991)

("The allowable unit of prosecution under section 78j(b) is, therefore, the use of a manipulative device or contrivance, which, as clarified by the SEC in Rule 10b–5, does not have to be the complete scheme to defraud; rather, it can be any false statement of material fact in connection with a discrete purchase or sale of a security.").[3]

 In the present case, the basic premise of the Defendants' position–that the fraudulent "device" at issue is the single scheme outlined in Count One–is flawed. Counts Two through Sixteen list different classes of securities that are governed by different terms and conditions (Tr. 24–25) and likely involve different buyers who were defrauded by various misrepresentations. Without conceding that more than one conspiracy existed, the government may elect to charge separate fraudulent transactions in separate counts by showing a connection between a prohibited activity defined by Rule 10b–5 and a security identified in Counts Two through Sixteen. The Court therefore concludes that on their face Counts Two through Sixteen are not multiplicitous.

C. *Motion to Dismiss Counts Seventeen Through Twenty–One (Wire Fraud)*

Counts Seventeen through Twenty–One incorporate by reference the previous allegations in Count One and charge Defendants with wire fraud in violation of 18 U.S.C. §§ 1343, 1346, and 2. (Indictment

---

**3.** Section 17(a) of the Securities Act of 1933, which closely parallels the language of Rule 10b–5, has been construed in a manner which supports this interpretation. *United States v. Schlei,* 122 F.3d 944, 979 (11th Cir.1997) ("[T]he chargeable offense under § 77q(a) is each separate offer or sale of a security in connection with an instrumentality of interstate commerce."); *United States v. Waldman,* 579 F.2d 649, 654 (1st Cir.1978) ("We agree with every other circuit that has faced the

question that the appropriate units of prosecution under 77q(a) are separate transactions accompanied by use of the mails."); *United States v. Binstock,* 37 F.R.D. 13, 16 (S.D.N.Y. 1965) ("[I]f there are separate offers or sales of securities to different persons, there are separate offenses under 15 U.S.C. § 77q(a)."); *see generally Langford,* 946 F.2d at 803–04 (explaining the similarity between Section 10(b), Rule 10b–5, and Section 17(a)).

¶¶ 208–09). Pursuant to Federal Rules of Criminal Procedure 7(c) and 12(b), Michael Rigas moves to dismiss Counts Seventeen through Twenty–One of the Indictment.

Rule 7(c)(1) requires an indictment or information to be "a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed.R.Crim.P. 7(c)(1). To meet this standard an indictment "must sufficiently inform the defendant of the charges against him and provide enough detail so that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Bustos De La Pava,* 268 F.3d 157, 162 (2d Cir.2001). "An indictment, however, need not be perfect, and common sense and reason are more important than technicalities." *Id.*

The wire fraud statute states in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... communication in interstate ... commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall [be guilty of a crime].

18 U.S.C. § 1343 (2000).

"The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." *United States v. Autuori,* 212 F.3d 105, 115 (2d Cir.2000). Focusing on the required relationship between the wire communications and the scheme, Michael Rigas argues that the five wire transfers forming the basis of Counts Seventeen through Twenty–One have an insufficient nexus to any aspect of the Adelphia Scheme alleged in Count One other than the so-called "margin call" scheme. Briefly described, the margin call scheme outlined in ¶¶ 174–90 of the Indictment alleges that Defendants made several payments from Adelphia's centralized Cash Management System to cover substantial margin calls on the Rigas family's Adelphia common stock holdings. The dates and amounts of the payments made to satisfy the margin calls correspond to the dates and amounts of the wire transfers listed in Counts Seventeen through Twenty–One. (*Compare* Indictment ¶ 184 *with id.* ¶ 209.) Given this correspondence, Michael Rigas contends that these Counts are defective insofar as they allege that the wire transfers were in furtherance of any non-margin-call aspect of the Adelphia Scheme.

To meet the "in furtherance" requirement, however, a mail or wire communication "need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme or a step in [the] plot." *Schmuck v. United States,* 489 U.S. 705, 710–11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (internal quotations and citations omitted); *see also United States v. Tocco,* 135 F.3d 116, 124 (2d Cir.1998) (same); *United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989) ("[T]he government must prove ... that the mailing was for the purpose of executing the scheme or, in other words, incident to an essential part of the scheme.") (internal quotations and citations omitted).[4] As indicated in the above discussion of the motion to dismiss Count One, the Indictment describes a single scheme to defraud Adelphia's investors

---

4. Although the cited cases addressed the mail fraud statute, 18 U.S.C. § 1341, the wording of the two statutes is identical in relevant part, and they are interpreted similarly. *United States v. Slevin,* 106 F.3d 1086, 1088 (2d Cir.1996); *see also Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

and creditors. A rational jury could conclude that the listed wire transfers perpetuated the erroneous perception that the Rigas family continued to stabilize Adelphia (Indictment ¶ 187), thus furthering the Adelphia Scheme by concealing the extent of Adelphia's financial difficulties. Unlike the cases relied upon by Defendants, the wire communications here were neither made by third parties outside of Adelphia's corporate structure, *United States v. Giraldi*, 864 F.2d 222 (1st Cir.1988); *United States v. Pimental*, 236 F.Supp.2d 99 (D.Mass.2002), nor were they part of Adelphia's normal business practices and wholly unrelated to the fraudulent scheme. *United States v. Pintar*, 630 F.2d 1270 (8th Cir.1980); *see also United States v. Altman*, 48 F.3d 96, 102–03 (2d Cir.1995) (concluding that the mailings relied upon by the government–none of which originated with the defendant–occurred after the scheme was complete and did nothing to further the scheme). Here, it is reasonable to view the use of the wire transfers to pay substantial margin calls on Rigas family accounts as a "step in the plot" to mask Adelphia's true financial condition and the alleged fraudulent practices that were its cause. Thus, Counts Seventeen through Twenty–One are sufficient as a matter of law, and the motion to dismiss is denied. *See United States v. Caldwell*, 302 F.3d 399, 410–11 (5th Cir.2002) (rejecting a similar challenge based on Rule 7(c)).

D. *Motion to Dismiss Counts Twenty–Two and Twenty–Three (Bank Fraud)*

Counts Twenty–Two and Twenty–Three allege that Defendants committed bank fraud by falsely representing that the borrowers on two syndicated credit agreements were in compliance with certain material terms of both agreements. As explained in Count One, much of which is incorporated by reference in Counts Twenty–Two and Twenty–Three (Indictment ¶ 210), the bank fraud charges relate to Adelphia's strategy of obtaining capital by organizing certain borrowing groups of Adelphia subsidiaries that, in turn, would enter into secured, syndicated bank loans under certain credit facilities. These credit facilities required that the borrowing group meet certain conditions–including specified leverage ratios and ratios of annualized operating cash flow to debt service–and provide quarterly reports to its lenders as to whether the borrowing group was in compliance with the terms of the credit facility. (Indictment ¶¶ 29–30.) Beginning in 1996, Adelphia subsidiaries entered into agreements (Co–Borrowing Agreements) with various cable entities controlled by the Rigas family (Cable RFEs) that allowed the borrowing of substantial sums of money under credit facilities established by the borrowing groups. The Co–Borrowing Agreements allowed any member, including a Cable RFE, to borrow up to the entire amount under the given facility and further provided that each member, including any Adelphia subsidiary, was jointly and severally liable for the full amount of the given facility. Thus, as both Adelphia and Cable RFEs continued to borrow funds to finance its various operations, Adelphia subsidiaries' possible liability under the credit facilities increased. More importantly, Adelphia's own financial instability affected its ability to remain in compliance with the terms of the credit facilities. Defendants' alleged fraudulent misrepresentations and omissions concerning these events form the core of the bank fraud charges.

The credit facilities at issue involved syndicates of banks and other lenders. Count Twenty–Two lists a "$2,250,000,000 credit agreement dated April 14, 2000 among Century Cable Holdings, LLC and other Adelphia affiliates, as borrowers, and Chase Manhattan Bank, Bank of America, Bank of New York, CIBC, Citibank, First

Union National Bank, Fleet National Bank, Mellon Bank, National City Bank of Pennsylvania, SunTrust Bank, U.S. Bank and other lenders, including numerous financial institutions located in New York, New York." (Indictment ¶ 211.) Count Twenty–Three lists a "$2,030,000,000 Credit Agreement among Olympus Cable Holdings, LLC and other Adelphia affiliates, as borrowers, and Fleet National Bank, Bank of America, Citicorp, First Union National Bank, Bank of New York, and other lenders, including numerous financial institutions located in New York, New York." [5] (*Id.*)

Michael Rigas makes a two-pronged attack on Counts Twenty–Two and Twenty–Three. He argues first that the defrauded syndicates are not "financial institutions" that can support a bank fraud charge under 18 U.S.C. § 1344. In addition, he avers that both Counts should be dismissed as duplicitous. Neither argument has merit.

Section 1344 provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be [guilty of a crime].

18 U.S.C. § 1344 (2000).

■ "In order to show bank fraud, the government must prove that defendant (1) engaged in a course of conduct designed to deceive [a financial institution] into releasing property; and (2) possessed an intent to victimize the institution by exposing it to actual or potential loss." *United States v. Crisci*, 273 F.3d at 235, 239–40 (2d Cir. 2001) (per curiam) (internal quotations omitted).

■ Michael Rigas first argues that, although the Indictment on its face alleges two separate $2 billion bank frauds, the identified frauds were in fact against two separate syndicates and not individual financial institutions as defined in the statute. 18 U.S.C. § 20 (2000) (defining "financial institution" as, *inter alia*, "an insured depository institution"). Notably, however, Michael Rigas does not argue that the syndicates at issue do not include financial institutions that meet the requirement of the statute, as is indicated by the banks listed in Counts Twenty–Two and Twenty–Three. For its part, the government does not contend that it will not be required to prove all the required elements with respect to the defrauded entities identified in the two Counts, nor does it attempt to argue that non-federally insured lenders meet the definition of "financial institution." By focusing on the singular form of "financial institution" in § 1344, then, Michael Rigas interprets this phrase as an inexorable command that only a fraudulent scheme affecting one financial institution can support a bank fraud charge. *See United States v. Hinton*, 127 F.Supp.2d 548, 554 (D.N.J. 2000) ("The plain language of the statute defines one of the elements of bank fraud as a scheme to defraud 'a financial institution,' not a scheme to defraud financial institutions."). Nothing in the context of

---

**5.** The original Indictment named only Chase and the Bank of Montreal in these Counts. The government later conceded that the Bank of Montreal was not federally insured and thus would not provide a proper basis for a bank fraud charge. (Letter of Assistant United States Attorney Clark to the Court of 5/29/03.) The superceding Indictment addresses this problem by providing a more extensive listing of federally insured banks in both Counts.

the statute supports such a rigid reading, however, and Defendants' interpretation may in fact unnecessarily truncate a statute that the Second Circuit has read "expansively." *United States v. Barrett,* 178 F.3d 643, 647 (2d Cir.1999); *see also* 1 U.S.C. § 1 (2000) ("In determining the meaning of any Act of Congress, unless the context indicates otherwise–words importing the singular include and apply to several persons, parties, or things[.]"). The Court therefore will not dismiss Counts Twenty–Two and Twenty–Three on the grounds that they fail to allege that Defendants defrauded a financial institution as defined in § 1344 and § 20.

■ Michael Rigas's duplicity argument is also rejected. Again focusing on the syndicated nature of the debt at issue, he argues that the alleged fraud was against multiple entities, the identities of which were changing due to trading of the debt in the secondary market, and furthermore that the involvement of more than one entity in each syndicate means that each count contains multiple violations under § 1344. In agreement with other Circuits, however, the Second Circuit has concluded that "the plain language of § 1344 punishes each *execution* of a fraudulent scheme." *United States v. Harris,* 79 F.3d 223, 232 (2d Cir.1996) (emphasis added) (citing cases). The number of affected banks is not the sole determinant of whether there are separate executions of a scheme. *See United States v. Saks,* 964 F.2d 1514, 1526 (5th Cir.1992) (holding that separate actions taken in connection with a single fraudulent transaction involving three related banks were not separate executions of a scheme). Rather, courts have addressed this fact-intensive question by considering "whether the acts were chronologically and substantively independent from the overall scheme." *Harris,* 79 F.3d at 232; *see also United States v. Anderson,* 188 F.3d 886, 889 (7th Cir.1999) (listing several factors to consider when

determining whether an act constitutes a separate execution of a scheme, "including, but not limited to, the ultimate goal of the scheme, the nature of the scheme, the benefits intended, the interdependence of the acts, and the number of parties involved."); *United States v. Sain,* 141 F.3d 463, 473 (3d Cir.1998) ("Not every act in furtherance of a fraudulent scheme is a separate 'execution' of the scheme."); *United States v. Lilly,* 983 F.2d 300, 304– 05 (1st Cir.1992) (explaining the significance of separate executions of the scheme).

■ In the present case, Counts Twenty–Two and Twenty–Three list single agreements for fixed amounts, and a reasonable jury could conclude that the alleged false representations concerning Adelphia's compliance with these agreements, though occurring quarterly, were essentially a continuing and related series of steps to attain those amounts on the best terms possible. The decision to charge Defendants with two executions of fraudulent schemes based on the two credit facilities does not render Counts Twenty–Two and Twenty–Three impermissibly duplicitous. The motion to dismiss is denied.

### E. *Mulcahey's Motion to Dismiss*

In addition to joining the motions outlined above, Mulcahey argues that all counts in the Indictment, other than those resting on factual allegations in certain specified paragraphs, should be dismissed for failure to comply with Federal Rules of Criminal Procedure 7(c)(1) and 7(c)(2), and the constitutional requirements embodied therein. *See United States v. Pirro,* 212 F.3d 86, 91 (2d Cir.2000) (noting that Rule 7(c)(1) reflects the constitutional requirement that an indictment contain the essential facts constituting the offense charged).

The Court rejects this argument. As described above and in this Court's April 2003 opinion, *Rigas,* 258 F.Supp.2d at 301–03, the Indictment outlines in detail the essential facts constituting the offenses alleged. In addition, it includes specific factual allegations against Mulcahey. (*E.g.,* Indictment ¶¶ 61, 63–64, 68–71, 82, 160–66, 205(*l* ), 205(n), 205(p).) Interpreted in light of common sense and reason, *Bustos De La Pava,* 268 F.3d at 162, the Indictment provides the level of detail required by Rule 7(c)(1), and Mulcahey's broad attack is not well-taken.

 Nor does the forfeiture allegation require dismissal. Rule 7(c)(2) provides that "[n]o judgment of forfeiture may be entered in a criminal proceeding unless the indictment or the information provides notice that the defendant has an interest in property that is subject to forfeiture in accordance with the applicable statute." Fed. R.Crim. Pro. 7(c)(2); *see also* Fed. R.Crim. Pro. 32.2 (requiring notice to the defendant prior to any judgment of forfeiture). The notice provision "is not intended to require that an itemized list of the property to be forfeited appear in the indictment" and "does not require a substantive allegation in which the property subject to forfeiture, or the defendant's interest in the property, must be described in detail." Fed. R.Crim. Pro. 32.2 advisory committee's note (2000). In the present case, the forfeiture allegation incorporates the previous factual allegations and identifies the Defendants, the amount subject to forfeiture, and the statutory sections upon which the government relies for its forfeiture allegation. (Indictment ¶¶ 212–13.) Rule 7(c)(2) does not require further specification.

## F. *Motions to Sever*

Michael Rigas and John Rigas each move separately for an order severing their respective trials from that of their codefendants. Citing Federal Rule of Criminal Procedure 14, Michael Rigas argues that the paucity of evidence against him with regard to many specific allegations in the Indictment, combined with the complexity of the case and the familial connection between him and other codefendants, risks the possibility of "spillover prejudice" and guilt by association resulting from the collective weight of evidence against other Defendants.

Federal Rule of Criminal Procedure 8(b) provides for the joinder of two or more defendants in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts of acts or transactions constituting an offense or offenses." Rule 8(b) reflects preference in the federal system for joint trials of defendants who are indicted together. *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *see also United States v. Salameh,* 152 F.3d 88, 115 (2d Cir.1998) (noting that the preference for trying defendants together is particularly strong "where, as here, the defendants are alleged to have participated in a common plan or scheme").

 Nevertheless, even if joinder is proper, Rule 14(a) also recognizes that severing defendants' trials may be necessary if it appears that a defendant is prejudiced by such a joinder. Fed. R.Crim. Pro. 14(a). The defendant's burden under Rule 14 is fairly exacting. "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent a jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. Even in cases where the risk of prejudice may be high, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.*

■ Michael Rigas has not shown that a serious risk of prejudice requires separating his trial from that of his codefendants. As an initial matter, his concern over the possibility of jury confusion is unfounded. Nothing in the Indictment or the nature of this case suggests that a joint trial will be too complex, or that the jury will be incapable of distinguishing between individual members of the Rigas family for the purpose of considering the evidence against each Defendant separately. *See United States v. Williams,* 181 F.Supp.2d 267, 301 (S.D.N.Y.2001) (denying, in a multi-faceted conspiracy case, a motion for severance by one of three defendants with the same last name).

Nor does a serious risk of guilt by association or "spillover prejudice" arise from any alleged difference in the number or detail of the allegations against him as compared to his codefendants. Despite his efforts to the contrary, on the face of the Indictment, Michael Rigas's role in the Adelphia Scheme and relationship with its major players cannot be accurately characterized as involving only a "small portion of the indictment" and for which only "a small portion of the evidence is relevant." *United States v. Upton,* 856 F.Supp. 727, 736 (S.D.N.Y.1994). The Indictment alleges that he committed multiple acts, typically in concert with one or more codefendants, in furtherance of the conspiracy. (Indictment ¶¶ 68–71, 77–81, 130–38, 154–58.) Even assuming *arguendo* that Michael Rigas had only peripheral involvement in certain aspects of the Adelphia Scheme, this fact would not require severance, as "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Scarpa,* 913 F.2d 993, 1015 (2d Cir.1990) (internal quotations omitted).

Michael Rigas's position is therefore distinguishable from the cases he cites in support in which spillover prejudice to a defendant supported a motion to sever. *Williams,* 181 F.Supp.2d at 300–01 (granting severance where the defendant was the only defendant who was not death-eligible and the defendant would be prejudiced by the introduction of evidence relating to violent crimes that formed part of the unrelated charges against the other defendants); *Upton,* 856 F.Supp. at 736 (granting severance in complex case involving defendants who were from a different city and were named in a "small portion of the indictment and against whom a small portion of the evidence is relevant."); *United States v. Gilbert,* 504 F.Supp. 565, 570–71 (S.D.N.Y.1980) (finding a risk of prejudice because a defendant–described as an "innocent dupe"–had a disproportionate involvement with the overall scheme and was otherwise unfamiliar with the principal defendant's machinations). There is no indication here of the type of spillover prejudice that disturbed the courts in *Williams, Upton,* or *Gilbert.* In sum, at this stage of the proceeding, the Court does not perceive a serious risk of prejudice requiring a separate trial of Michael Rigas.

John Rigas's motion to sever relies on similar grounds and is without merit for similar reasons. John Rigas is prepared to concede that the allegations are sufficient regarding his involvement in so-called "external" activity, by which he means, in general, the diversion of Adelphia corporate funds to his personal or Rigas family use. He argues, however, that the Indictment insufficiently alleges his involvement in certain "internal" aspects of the Adelphia scheme. By "internal" activities, he means conduct related to internal Adelphia business practices unrelated to Rigas family activity, i.e., the misrepresentations to Moody's and other investors, and the misrepresentations in connection with Adelphia's high-speed internet and cable subscribers. Relying on *United States v. McDermott,* 245 F.3d 133 (2d Cir.2001), he

**674**

contends that the failure to allege an agreement by him that includes the internal wrongdoing at Adelphia requires that his trial be severed from that of his codefendants.

*McDermott* involved an alleged conspiracy arising out of a love triangle in which McDermott's insider stock tips to his girlfriend were passed on, unbeknownst to him, to her other lover. The Second Circuit reversed McDermott's conspiracy conviction, which was based on the theory that he was a co-conspirator with his girlfriend and her lover. *McDermott*, 245 F.3d at 137. The court held that the evidence was insufficient as a matter of law to show that McDermott was a member of a single conspiracy that included both the girlfriend and her other boyfriend, and further concluded that McDermott was prejudiced by his joint trial with the boyfriend.

*McDermott* presented a very different factual scenario and does not support John Rigas's effort to attack the Indictment as too generic regarding his involvement in the internal aspects of the Adelphia Scheme. In the present case, unlike the defendants in *McDermott*, John Rigas is not charged with agreeing with a person who he has never met and to an entire course of conduct of which he has no knowledge; rather, he is charged with a conspiracy that involved at least two of his sons and a company of which he was the President, Chairman, and CEO. In light of these allegations, the Court perceives no serious risk of prejudice to John Rigas that would require a separate trial. His motion to sever is denied.

**CONCLUSION**

For the foregoing reasons, Defendants' joint and individual motions are denied. SO ORDERED.